UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| SHANNON WESTBROOK,<br><br>                              Plaintiff,<br><br>          v.<br><br>DR. STEVE HAMMOND, ED LOPEZ,<br>WASHINGTON STATE<br>DEPARTMENT OF CORRECTIONS,<br>KATHY RENINGER, and JOHN AND<br>JANE DOE,<br><br>                              Defendants. | No. C10-5392 BHS/KLS<br><br>**REPORT AND RECOMMENDATION**<br>**Noted for:  June 10, 2011** |

Presently before the Court is the Motion for Summary Judgment of Defendants Steve

Hammond, Ed Lopez, Washington State Department of Corrections (DOC), and Kathy Reninger.

ECF No. 26.  Governor Christine Gregoire, Secretary Eldon Vail and Patrick Glebe joined in the

motion.  *Id.*  However, this action is proceeding on Plaintiff's Amended Complaint, which only

names Defendants Hammond, Lopez, DOC and Reninger.  ECF No. 7.  To date, Plaintiff has not

identified John Doe or Jane Doe.  Plaintiff has filed no response to Defendants' motion for

summary judgment.  His failure to file papers in opposition may be deemed as an admission that

the Defendants' motion has merit.  Local Rule 7(b)(2).

Having reviewed the motion, opposition and supporting declarations and balance of the

record, the Court recommends that the motion for summary judgment be granted.

REPORT AND RECOMMENDATION - 1

## STATEMENT OF FACTS

In this Section 1983 action, Plaintiff Shannon Westbrook sues Defendants DOC, Hammond, Lopez and Reninger for damages and injunctive relief stemming from a right bicep injury sustained when Plaintiff was lifting weights at the weight room at the Stafford Creek Corrections Center (SCCC).  Plaintiff alleges that Defendants were deliberately indifferent to his medical needs in violation of the Eighth Amendment, that they violated his Fourteenth Amendment right to due process by "vindictive institutional moves," and that they committed negligence and medical malpractice.  Plaintiff further alleges that Defendants conspired to deny him an orthopedic consult and surgery and subjected him to "vindictive institutional moves" in retaliation after he filed an emergency grievance.

**A.     Plaintiff's Injury and Initial Care**

Plaintiff states that on March 15, 2009 at 8:15 p.m., he injured his right bicep while he was doing curls at the SCCC weight room.  ECF No. 7, p. 6.  He was seen at the infirmary by a nurse and told to return to the infirmary the next day.  *Id.*  On March 16, 2009, he was seen by Physician Assistant Ed Lopez.  *Id.*

Defendant Edwin Lopez is a contract employee physician assistant at SCCC, who is responsible for triaging, evaluation, diagnosis, initial treatment and chronic medical management of ill and injured offenders at the SCCC under the supervision of Dr. Steven Hammond.   ECF No. 26-2, pp. 2-3.  Defendant Lopez provided his declaration and Plaintiff's medical records. ECF No. 26-2, pp. 2-25.  According to Defendant Lopez, when Plaintiff was examined by nursing staff on March 15, 2009, swelling in the area of his right bicep area was noted.  Plaintiff denied pain during the exam and was scheduled for the follow-up appointment the next day. Defendant Lopez examined Plaintiff then and noted muscle swelling in his right bicep, but a

fully functioning range of motion without neurological abnormality.  ECF No. 26-2, pp. 3 and 6 (Exh. A).   Defendant Lopez diagnosed a right distal bicep tendon rupture.  Plaintiff was prescribed pain medication, an arm sling and an extra pillow for comfort.  *Id.*  After Defendant Lopez discussed the case with his supervisor, Dr. Hammond, he submitted a consultation request to the CRC for approval of an orthopedic consultation for the Plaintiff.   *Id.*  A review of the request for an orthopedic consult was scheduled for presentation to the DOC Care Review Committee (CRC) for March 25, 2009.  *Id.*, p. 3.

Plaintiff returned to the medical clinic on March 24, 2009, stating that the pain medication was ineffective.  Defendant Lopez prescribed stronger pain medication.  ECF No. 26-2, pp. 3 and 8 (Exh. B).  The CRC met on March 25, 2009 and denied the request for the orthopedic consultation.  *Id.*, p. 3.

**B.     Care Review Committee (CRC) and Offender Health Plan (OHP)**

Defendant Steven Hammond is a medical doctor and is currently the Chief Medical Officer for the DOC.   ECF No. 26-1, p. 3.  His duties include overseeing the quality, safety, and appropriateness of medical care provided to offenders in DOC custody.  *Id.*  Dr. Hammond has reviewed Plaintiff's medical records, was involved in Plaintiff's case as Acting Medical Director at SCCC at the time Plaintiff was injured, and participated as a member of the CRC that reviewed the request for an orthopedic consult.  ECF No. 26-1, pp. 4-5.  In his declaration, Dr. Hammond describes the process of reviewing the medical necessity of proposed health care, as follows:

The DOC Medical Care Review Committee (CRC) is a group of DOC primary care physicians, physician assistants (PAs), and advanced registered nurse practitioners (ARNPs) constituted according to the DOC Offender Health Care Plan (OHP) to review the medical

necessity of proposed health care within a cluster of DOC facilities.  Medical CRC meetings are convened weekly to review medical issues that arise at various prisons in DOC.  All final CRC decisions are made by a simple majority vote of the medical professionals who are part of the CRC panel and who participate in the discussion of a proposed medical intervention.  The decision of the CRC is recorded on the CRC Report, but the individual votes of the members are not recorded.  ECF No. 26-1, p. 3.

In making recommendations, the CRC relies on the professional judgment of the medical professionals who make up the CRC concerning whether the proposed treatment is medically necessary.  In making this determination reference is made to the DOC Offender Health Plan (OHP), which includes the Washington DOC Levels of Care Directory.  *Id.* and (Attach. A).  The OHP sets forth three Levels of Care:  (1)  Level 1:  care that is medically necessary, which is authorized; (2) Level 2:  care that in certain cases as determined by the CRC is medically necessary; and (3) Level 3:  care that is not medically necessary and not authorized.  ECF No. 26-1, p. 3; Attach. A, pp. 11-12.  The conditions listed in the Levels of Care Directory are not intended to be all-inclusive but are intended to be a guide for clinical decision making to help ensure uniformity for decisions about common medical conditions.  Primary determinants of medical necessity according to the OHP are whether the treatment is necessary to "save life or limb," is necessary to treat intractable pain, or is necessary to preserve the ability to perform activities of daily living (ADLs).  ECF No. 26-1, p. 4, Attach. A at 8.  Another criterion for medically necessary care is if immediate intervention is not medically necessary, but delay of care would make future care or intervention for intractable pain or preservation of ADLs significantly more dangerous, complicated, or significantly less likely to succeed.  *Id.*  Activities of daily life are defined as basic self-care activities such as feeding, dressing, and cleaning

REPORT AND RECOMMENDATION - 4

oneself.  *Id.*, p. 7.  Medical conditions which are not medically necessary (and not authorized to be provided under the OHP) include treatment "that gives little improvement in quality of life" and "offers minimal relief of symptoms."  *Id.*, p. 12.

Consultants may make recommendations that are not medically necessary as defined in the OHP.  The OHP specifically lists as Level 3 care, "Consultant recommendations (including instructions and orders), when not a Level 1 intervention."  When a consultant makes a recommendation, the recommendation may be referred to the CRC to decide whether implementation of the recommendation in the case under consideration is medically necessary.  If it is found to be not medically necessary, the condition is categorized as a Level 3 condition and the recommendation that the consultation be covered under the OHP is denied.  In the event an offender wants to pursue treatment not categorized as a Level 1 intervention, DOC Policy 600.020 provides the offender with the option of pursuing such treatment using his own funds. *Id.*, p. 5 (Attach. B – DOC Policy 600.020, Offender Paid Health Care).

**C.    CRC Review of Plaintiff's Injury**

On March 25, 2009, the CRC convened and reviewed Defendant Lopez's consultation request.  ECF No. 26-1, p. 5.  The CRC panel included 25 voting members, including Dr. Hammond.  *Id.*  Dr. Hammond states that the CRC panel reviewed the Plaintiff's medical record and noted that he had full range of motion and was able to perform all activities of daily living. The CRC panel denied the Plaintiff's request for an orthopedic consult after determining that the proposed medical intervention was not medically necessary, as it did not meet the criteria of a Level 1 medical intervention under the OHP.  It was recommended that the Plaintiff and his medical providers undertake conservative management of his condition, including pain control as needed, physical therapy, and education regarding the outcome of non-surgical management.  In

REPORT AND RECOMMENDATION - 5

addition, the Plaintiff was to be educated on the option of pursuing a surgical consultation under the terms of DOC Policy 600.020, if he so desired.  *Id.*

**D.      Plaintiff's Care Following CRC Determination**

On March 27, 2009, the Plaintiff was called into the medical clinic and Defendant Lopez informed him of the CRC determination.   ECF No. 26-2, p. 3.  Defendant Lopez also informed Plaintiff of his option to pursue surgery using his own resources.  *Id.* Defendant Lopez performed another examination of the Plaintiff and recommended physical therapy, x-rays and prescribed short term stronger pain medication.  *Id.*, pp. 3 and 11 (Exh. C).

Defendant Lopez saw Plaintiff again on April 23, 2009 to review his x-ray results.  ECF No. 26-2, pp. 4 and 13 (Exh. D).  Plaintiff reported that his right arm was fully working with no pain.  He requested to be cleared of all medical restrictions so that he could return to work. Defendant Lopez examined Plaintiff's arm and it appeared to be anatomically improved and symmetrical, had a full range of motion with and without resistance and was neuro-vascularly intact.  *Id.* Defendant Lopez removed Plaintiff's medical restrictions as Plaintiff had requested and recommended that Plaintiff not return to weight lifting at that time.  *Id.*

Plaintiff returned to the SCCC medical clinic on May 14, 2009, stating that he felt sharp pains in his right arm.  He was seen again at the medical clinic on June 3, 2009 complaining that his right arm hurt after playing baseball the day before.  ECF No. 26-1, pp. 6 and 56-57 (Attach. D).  Plaintiff stated that his pain was intermittent depending on certain activities, such as opening doors and he was unable to lift a 15 pound dumbbell in the weight room.  *Id.*  He further noted to the attending provider that Defendant Lopez had informed him not to work out but that he had been "over doing it" with his sports activities.  *Id.*  An examination performed on that

REPORT AND RECOMMENDATION - 6

date showed that Plaintiff had upper and forearm strength against resistance, full range of motion and full pronation and supination of the forearms.  *Id.*

On June 9, 2009 Plaintiff attended physical therapy.  He reported weight lifting 25 to 30 pounds, but complained of being unable to curl 7 to 10 pounds.  On July 7, 2009, physical therapy was stopped when Plaintiff complained of pain.  ECF No. 26-1, p. 6.  In the medical notes attached to Plaintiff's complaint, the physical therapist noted that he felt Plaintiff would benefit most from having a surgical repair.  ECF No. 7, p. 17.  Defendant Lopez saw Plaintiff again on July 15, 2009.  At that time, Defendant Lopez recommended another CRC review for a possible orthopedic consult.  ECF No. 26-2, pp. 4 and 15 (Attach. E).

On August 4, 2009, the CRC again classified Plaintiff's medical condition as a Level 3 condition and denied orthopedic intervention.  ECF No. 26-1, p. 6.

Plaintiff was seen again at the SCCC medical clinic on August 19, 2009 and September 10, 2009 with complaints of right arm pain.  Pain medication was prescribed.  ECF No. 26-1, p. 6.  By January of 2010, Plaintiff was no longer taking pain medication.  On January 28, 2010, Plaintiff complained of right arm pain when attempting to lift more than 10 pounds and difficulty with tasks requiring hand rotation.  An examination performed on January 29, 2010 revealed a small mass in the upper portion of Plaintiff's right arm but good right arm strength.  On March 10, 2010, Plaintiff who was scheduled for transfer to a work camp, reported to the medical clinic at SCCC that he could not work because of his right arm.  He stated that he could lift any amount of weight straight up, but could not do arm curls while weight lifting.  He noted pain when he flexed his arm at certain times.  Plaintiff was assigned a low bunk and a 10 pound weight lifting limitation.  Plaintiff was transferred to the Coyote Ridge Corrections Center (CRCC) on May 5, 2010.  ECF No. 26-1, p. 7.

REPORT AND RECOMMENDATION - 7

Dr. Elizabeth Suiter is the medical director at the CRCC, who is responsible for the oversight of medical care provided to inmates of CRCC and for maintaining records of the medical treatment provided to CRCC inmates.  ECF No. 26-2, pp. 17-18.  According to Dr. Suiter, CRCC is a work release facility.  Only inmates who are suitable for work under minimal supervision, both from a security standpoint and a physical standpoint, are placed at CRCC. DOC records indicate that Plaintiff arrived at CRCC in May of 2010.  On May 17, 2010, CRCC medical staff noted that Plaintiff sustained a rupture of the right bicep tendon more than one year before.  The examination revealed some soft tissue swelling but no other abnormalities.  *Id.*

On June 22, 2010, Plaintiff's visit to the CRCC medical clinic involved a follow-up to an earlier eye examination concerning Plaintiff's ongoing condition of glaucoma.  The record of this date also noted that his right bicep tear now "15 months out but with good function."  Plaintiff was referred for work with the only restriction that he lift no more than 20 pounds with his right arm and do no repetitive lifting with his right arm.  *Id.*, pp. 18 and 22 (Exh. A).

After being cleared for work, Plaintiff has worked at CRCC as a unit porter with no further reports of physical problems with his right arm.  Records indicate that he participates in recreation and lifts weights on a regular basis at the facility.  ECF No. 26-2, p. 18; ECF No. 26-2, pp. 24-25.  According to Julia M. Lange, a recreation/athletics specialist at the CRCC, Plaintiff has paid to use the weight room at CRCC since July 1, 2010 and is paid up to continue to use the weight room through March 2011.  ECF No. 26-2, pp. 24-25.  Ms. Lange describes Plaintiff as a "regular" in the weight room and she has witnessed Plaintiff lifting weights and doing a variety of exercises that require the use of his arms.  Such exercises include lifting 50 pound dumbbells with each arm and using the pull up machine with arm straps.  He also jumped rope frequently. *Id.*, p. 25.

REPORT AND RECOMMENDATION - 8

1        Since June 22, 2010, Plaintiff has been seen in the CRCC medical clinic for the treatment

2  of allergies in July 2010, ongoing treatment of glaucoma, and a hospitalization in October of

3  2010 for a sore throat and fever.  ECF No. 26-2, p. 19.  Although Plaintiff takes medication for

4  other medical conditions (including hydrochlorothiazide for hypertension and medication for

5  glaucoma), he is not presently taking pain medication or any medications related to his right

6  bicep tear.  *Id.*

7        Dr. Suiter opines that in terms of reasonable medical probability, Plaintiff's condition

8  does not limit Plaintiff in any of his normal activities of daily living, does not limit his ability to

9  work in most occupations without restrictions and does not limit his ability to participate in

10  recreation, including weight lifting.  He does not exhibit ongoing pain from this condition.

11  Plaintiff has a visible "muscle ball" or soft tissue swelling on his upper right extremity as a result

12  of his injury.  According to Dr. Suiter, however, this abnormality is not significant in terms of

13  function as his upper arm is served by many other muscles beside the muscle that was injured in

14  March of 2009.  As a consequence, Dr. Suiter states that typically, the only residual limitation is

15  loss in maximum supination strength of the affected forearm.  Supination is the motion of the

16  forearm when the palm of the hand faces upwards.  *Id.*

17        It is further Dr. Suiter's opinion, in terms of reasonable medical probability, that an

18  orthopedic consult and possible surgical intervention is not medically necessary in Plaintiff's

19  case.  Surgical repair is rarely advised and then only for high performance athletes.  As the

20  physician who presently oversees Plaintiff's medical care, she fully concurs with the decision of

21  the CRC that an orthopedic consult and possible surgical intervention is not medically necessary

22  in Plaintiff's case.  *Id.*, p. 20.

REPORT AND RECOMMENDATION - 9

Dr. Hammond opines that the expected outcome of Plaintiff's injury with non-surgical management would be a roughly 40 percent loss of maximum supination strength, which he describes as the motion of the forearm so that the palm of the hand faces upward such as the motion used when turning a screw driver in with the right hand or screwing out with the left hand. ECF No. 26-1, p. 7. Aside from the loss of supination, a person with this type of injury would be excepted to have full strength and function of the injured arm without surgical intervention. Full healing and stabilization of function for the type of injury Plaintiff incurred would have occurred sometime within 6 to 12 months of the initial injury date. *Id.*

Dr. Hammond opines, on a more reasonable medical probability than not basis, that any limitations that Plaintiff may presently have as a result of his tendon injury do not and will not limit Plaintiff's ability to perform activities of daily living as defined in the OHP and that the injury has not caused persistent intractable pain as defined in the OHP. He further opines that it is apparent from the records that Plaintiff is able to pursue activities of daily living without significant limitation. He is able to work with minimal limitations and is actively pursuing recreational opportunities, including regular weight lifting. Dr. Hammond believes that the consultation requested, which may or may not have resulted in the consulting physician recommending surgical intervention, was not and is not medically necessary. It is also his opinion that the conservative treatment provided to Plaintiff met the applicable standard of care for treating Plaintiff's condition. ECF No. 26-1, p. 8.

Dr. Hammond also notes that, in the event Plaintiff's condition worsens, becomes a source of intractable pain (as defined in the OHP), or further impairs his ability to independently perform activities of daily living, his case could be brought before the CRC again as there is no limit on the number of CRC meetings for a particular condition. It is appropriate to re-present a

REPORT AND RECOMMENDATION - 10

case if pertinent new information becomes available.  To date, there has been no evidence that Plaintiff's condition has changed sufficiently to warrant re-presenting his case to the CRC.  ECF No. 26-1, p. 8; ECF No. 26-2, pp. 19-20.

In his complaint, Plaintiff alleges that after an orthopedic consultation order was submitted on March 17, 2009, he felt that he was not "getting the medical care that he should have gotten so, he exercised his rights and filed an Emergency Grievance."  ECF No. 7, p. 7. That "emergency grievance" is dated March 17, 2009, the same day the orthopedic consultation order was submitted.  *Id.,* p. 18.  Plaintiff alleges that he was denied proper medical care because Defendants provided him no more than "short term pain management."  *Id.*, p. 7.

## STANDARD OF REVIEW

Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact.  *Playboy Enterprises, Inc. v. Netscape Communications Corp*., 354 F.3d 1020, 1023-24 (9th Cir. 2004).  A nonmoving party's failure to comply with local rules in opposing a motion for summary judgment does not relieve the moving party of its affirmative duty to demonstrate entitlement to judgment as a matter of law.  *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

"If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial."  *Leisek v. Brightwood Corp*., 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)).  The non-

REPORT AND RECOMMENDATION - 11

moving party may not rely upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990). A court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir. 2001). This is true even when a party appears pro se. *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007).

Where, as here, the nonmoving party is pro se, a court must consider as evidence in opposition to summary judgment all contentions "offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the party appearing pro se] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (citation omitted), *cert. denied*, 546 U.S. 820, 126 S. Ct. 351, 163 L.Ed.2d 61 (2005).

**DISCUSSION**

To state a claim under 42 U.S.C. § 1983, at least two elements must be met: (1) the defendant must be a person acting under color of state law; and (2) his conduct must have deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled in part on other grounds, Daniels v. Williams*, 474 U.S. 327, 330-31 (1986). Implicit in the second element is a third element of causation. *See Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 286-87

REPORT AND RECOMMENDATION - 12

1   (1977); *Flores v. Pierce*, 617 F.2d 1386, 1390-91 (9th Cir. 1980), *cert. denied*, 449 U.S. 875

2   (1980).  When a plaintiff fails to allege or establish one of the three elements, his complaint must

3   be dismissed.  The Civil Rights Act, 42 U.S.C. § 1983, is not merely a "font of tort law."

4   *Parratt*, 451 U.S. at 532.  The plaintiff may have suffered harm, even due to another's negligent

5   conduct, but that does not in itself necessarily demonstrate an abridgement of constitutional

6   protections.  *Davidson v. Cannon*, 474 U.S. 344 (1986).

7           In addition, a plaintiff must set forth the specific factual basis upon which he claims each

8   defendant is liable. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). A defendant cannot be

9

10  held liable under 42 U.S.C. § 1983 solely on the basis of supervisory responsibility or position.

11  *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 n.58 (1978); *Padway v.

12  Palches*, 665 F.2d 965 (9th Cir. 1982). Rather, each defendant must have personally participated

13  in the acts alleged.  *Id.*  Vague and conclusory allegations of official participation in civil rights

14

15  violations are not sufficient to withstand a motion to dismiss.  *Peña v. Gardner*, 976 F.2d 469,

16  471 (9th Cir. 1992).

17  **A.      Eighth Amendment Claim of Deliberate Indifference to Medical Needs**

18          Deliberate indifference to an inmate's serious medical needs violates the Eighth

19  Amendment's proscription against cruel and unusual punishment.  *Estelle v. Gamble*, 429 U.S.

20  97, 105 (1976).  Deliberate indifference includes denial, delay or intentional interference with a

21  prisoner medical treatment.  *Id* at 104-05.  To succeed on a deliberate indifference claim, an

22  inmate must demonstrate that the prison official had a sufficiently culpable state of mind.

23

24  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  A determination of deliberate indifference

25  involves an examination of two elements: the seriousness of the prisoner's medical need and

26  the nature of the defendant's response to that need.  *McGuckin v. Smith*, 954 F.2d 1050 (9th

REPORT AND RECOMMENDATION - 13

Cir. 1992).  A "serious medical need" exists if the failure to treat a prisoner's condition would result in further significant injury or the unnecessary and wanton infliction of pain contrary to contemporary standards of decency.  *Helling v. McKinney*, 509 U.S. 25, 32-35; *McGuckin*, 954 F.2d at 1059.  Second the prison official must be deliberately indifferent to the risk of harm to the inmate.  *Farmer*, 511 U.S. at 834.

The objective component of an Eighth Amendment claim requires that the deprivation must be "sufficiently serious."  *Farmer*, 511 U.S. at 833.  "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' . . . are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*, 501 U.S. at 298 (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  The subjective component relates to the defendant's state of mind, and requires deliberate indifference.  *Farmer*, 511 U.S. at 833.  To withstand summary dismissal, a prisoner must not only allege he was subjected to unconstitutional conditions, he must allege facts sufficient to indicate that the officials were deliberately indifferent to his complaints.  *Id.*

A prison official is deliberately indifferent to a serious medical need if the official "knows of and disregards an excessive risk to inmate health or safety."  *Id.* at 835.  In order to prevail on a claim of deliberate indifference, the plaintiff must prove that the prison official was (1) actually aware of facts from which an inference could be drawn that a substantial risk of harm exists; and (2) that the official actually drew the inference; but (3) nevertheless disregarded the risk to the inmate's health.  *Farmer*, 511 U.S. at 837-38.

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim.  *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  Further, mere indifference, medical malpractice, or negligence will not support a cause of action under the

REPORT AND RECOMMENDATION - 14

Eighth Amendment.  *Broughton v. Cutter Lab.*, 622 F.2d 458, 460 (9th Cir. 1980).

Thus, to prevail in his Eighth Amendment claim, Plaintiff must show through admissible medical testimony that the decisions of all the medical professionals who diagnosed and treated him were in reckless disregard to his condition.  He has not done so.   Plaintiff alleges here that his Eighth Amendment rights were violated because he was denied orthopedic intervention for his right bicep injury.   However, Plaintiff has not shown that his injury amounts to a serious medical need.  Conversely, twenty-five medical practitioners, who convened for the purpose of reviewing Plaintiff's medical condition, made the determination that orthopedic intervention was not medically necessary to treat intractable pain or to allow Plaintiff to perform the activities of daily living.  ECF No. 26-1, p. 5.

The record reflects that Plaintiff maintains the ability to use his right arm, that he is a regular visitor at the weight room where he lifts heavy dumbbells with his right arm.  He is also able to work with minimal restrictions.  ECF Nos. 26-2, p. 25 and ECF No., 26-2, pp. 18-19.  The only residual evidence of Plaintiff's injury is a visible soft tissue swelling on his right upper arm and some limitation in supination movement of his right forearm.  According to Plaintiff's medical records and the undisputed medical testimony of his medical providers, these residual conditions do not significantly limit the function of Plaintiff's arm.  ECF No. 26-2, p. 19.

Plaintiff's medical records reflect that conservative treatment including physical therapy and pain management were provided to Plaintiff.  Plaintiff was seen by personnel at the SCCC medical clinic on at least twenty-five separate occasions during the ten month period following his injury.  His medical records show that each time Plaintiff visited the clinic, his complaints were addressed.  *Id*.   For example, on April 23, 2009, Plaintiff asked to have all medical restrictions removed because his right arm was fully working with no pain.  ECF No.

REPORT AND RECOMMENDATION - 15

26-2, pp. 4 and 13 (Attach. D).   On May 14, 2009, Plaintiff self-reported that he had been overdoing it with sports activities even though Defendant Lopez had advised him not to work out.  ECF No. 26-1, p. 57.  Thereafter, Plaintiff started to experience pain again in his right arm. Conservative treatment, including pain management was pursued.  *Id.*, p. 6.   The medical records reflect that when Plaintiff made a complaint of pain, he was seen promptly by SCCC medical staff.

Plaintiff does not allege that Defendants failed to respond promptly to his complaints. Rather, he complains that the "only treatment" he received was "short term pain management." ECF No. 7, p. 7.  Plaintiff maintains that the adequate medical care he required was a surgical consult and thereafter, a surgical repair to his right bicep.  However, there is no evidence that a surgical consult would have resulted in a medical opinion that surgical repair was necessary or that surgery would have improved Plaintiff's condition.  On the other hand, Plaintiff's medical doctors, including the doctor presently overseeing his medical needs, concur that an orthopedic consult and possible surgical intervention is not medically necessary in this case and that Plaintiff is not limited in his ability to perform his normal daily activities, including weight lifting.  *See,* ECF No. 26-1, p. 8; ECF No. 26-2, pp. 19-20.  There is no contrary medical evidence in the record.

Although Plaintiff believes that surgery is the more appropriate method for treating his condition, his medical providers obviously disagree.  Plaintiff does not allege that he is being denied all treatment, just that he is being denied the type of treatment he would like to receive. The record reflects that Defendants have a stated reason for their medical position.  Differences in judgment between an inmate and prison medical personnel regarding appropriate medical

REPORT AND RECOMMENDATION - 16

diagnosis and treatment are not enough to establish a deliberate indifference claim.  *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

Viewing the evidence in the light most favorable to Plaintiff, the undersigned concludes that the record reflects only that Plaintiff has shown that he has not been receiving the kind and quality of medical treatment he believes is indicated.  Such a claim is not cognizable under § 1983 and therefore, Defendants' motion for summary judgment on Plaintiff's claims that Defendants failed to provide him with medical care should be granted and the claims dismissed with prejudice.

**B.    Medical Malpractice/Medical Negligence**

Plaintiff alleges that the Defendants committed "the tort for negligence and medical malpractice," by "making medical decisions outside their training, knowledge and expertise." ECF No. 7, p. 9.   With the dismissal of Plaintiff's federal claims on the same facts, there is no justification for adjudicating his pendent state law tort claims.  Under *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), this Court has discretion to try pendent state claims with federal claims if they derive from a common nucleus of operative facts. However, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claim should be dismissed as well." *Id.* at 726, 86 S. Ct. at 1139 (footnote omitted).  *See also, Arizona v. Cook Paint & Varnish Co.*, 541 F.2d 226, 227-28 (9th Cir. 1976) (per curiam), *cert. denied*, 430 U.S. 915, 97 S.Ct. 1327, 51 L.Ed.2d 593 (1977) (reading *Gibbs* and *Wham-O-Mfg. v. Paradise Mfg. Co.,* 327 F.2d 748, 752-54 (9th Cir. 1964) as only requiring district courts not to reach out to decide state law questions that need not be decided).   Pendent state law claims should be dismissed without prejudice.  *See Les Shockley*

REPORT AND RECOMMENDATION - 17

1  *Racing, Inc. v. Nat'l Hot Rod Ass'n,* 884 F.2d 504, 509 (9th Cir. 1989) (citing *Carnegie-Mellon*

2  *Univ. v. Cohill,* 484 U.S. 343, 108 (1988)).

3          Thus, the undersigned recommends that Plaintiff's pendent state law tort claims be

4  dismissed without prejudice.

5  **C.      Fourteenth Amendment Due Process Claim**

6          In that portion of his complaint entitled "Claims for Relief," Plaintiff alleges that

7  Defendants "used vindictive moves to deprive the plaintiff of adequate medical care and to

8  punish and retaliate against [him] for exercising his civil rights as a prisoner."  ECF No. 7, p. 9.

9

10 In that portion of his complaint entitled "Relief Requested," Plaintiff asks for a declaratory

11 judgment stating that Defendants "used vindictive institutional moves in violation of the due

12 process clause of the Fourteenth Amendment …".  *Id.*  Plaintiff alleges no facts to explain this

13 conclusory statement.

14         As noted above, the undisputed evidence reflects that Plaintiff was not denied adequate

15 medical care.  In addition and to the extent Plaintiff is attempting to assert that he was denied due

16 process because he was transferred to another prison, his claim is without merit.  In order to state

17 a cause of action for deprivation of procedural due process, a plaintiff must first establish the

18 existence of a liberty interest for which the protection is sought.  *Sandin v. Connor,* 515 U.S.

19 472, 115 S. Ct. 2293, 2300, 132 L.Ed.2d 418 (1995).   However, prisoners have no constitutional

20 right to incarceration in a particular institution.  *See Olim v. Wakinekona*, 461 U.S. 238, 244-48

21 (1983).  A prisoner's liberty interests are sufficiently extinguished by his conviction that the state

22 may generally confine or transfer him to any of its institutions, to prisons in another state or to

23 federal prisons, without offending the Constitution.  *See Rizzo v. Dawson*, 778 F.2d 527, 530 (9th

24 Cir.1985) (*citing Meachum*, 427 U.S. at 225).   Neither do transfers from one prison to another

25

26

REPORT AND RECOMMENDATION - 18

violate the Eighth Amendment.  *See Sisbarro v. Massachusetts State Penitentiary*, 592 F.2d 1, 4-5 (1st Cir.), cert. denied, 444 U.S. 849 (1979).

Viewing the summary judgment evidence in the light most favorable to Plaintiff, the undersigned concludes that Plaintiff has failed to raise a material issue of fact relating to his claims that he was denied due process.  Accordingly, it is recommended that Plaintiff's Fourteenth Amendment due process claims be dismissed with prejudice.

**D.      Retaliation Claim**

In his complaint, Plaintiff alleges that Defendants conspired to deny him an orthopedic consult and surgery.  ECF No. 7, pp. 7-8.  In his claim for relief, Plaintiff states that Defendants "used vindictive institutional moves" to deprive him of medical care in retaliation after he filed an emergency grievance.  *Id.*, p. 9.

The Ninth Circuit has consistently held that prison staff may not retaliate against inmates for exercising their constitutional rights to file lawsuits and grievances.  *Rizzo v. Dawson*, 778 F.2d 527 (9th Cir. 1983); *Barnett v. Centoni*, 31 F.3d 813 (9th cir. 1994); *Pratt v. Rowland*, 65 F.3d 802 (9th Cir. 1995); *Rhodes v. Robinson*, 408 F.3d 559 (9th Cir. 2005).  In order to establish a retaliation claim, an inmate must show that: 1) a state actor took some adverse action against the inmate; 2) because the inmate engaged in constitutionally protected conduct; 3) the adverse action chilled the inmate's exercise of First Amendment rights; and, 4) the adverse action did not reasonably advance a legitimate correctional goal.  *Rhodes*, 408 F.3d at 567-68.

It is undisputed that Plaintiff filed a grievance on the same day that the first consult was submitted to the CRC.  It is also undisputed that Plaintiff has a clearly established right to be free of retaliation for exercising his First Amendment rights.  See *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989); *Carepartners LLC v. Lashway*, 545 F.3d 867, 877 (9th Cir.

REPORT AND RECOMMENDATION - 19

2008).   However, in order to prevail on a retaliation claim, Plaintiff must next show that the protected conduct was a substantial or motivating factor in the defendants' conduct. *Carepartners*, 545 F.3d at 877.   Only after he makes this initial showing does the burden shift to the Defendants to establish that they would have reached the same decision even in the absence of the protected conduct. *Id*.

Other than the timing of Plaintiff's grievance, there is no evidence that Defendants retaliated against Plaintiff.   Retaliation is not proven by simply showing that a defendant prison official took adverse action after he knew that the plaintiff prisoner had engaged in constitutionally protected activity.   Although timing can be considered as circumstantial evidence of retaliatory event, timing alone cannot establish retaliation. *See Pratt v. Rowland*, 65 F.3d at 808.

As noted by one district court, "merely being aware of ongoing litigation does not establish that all adverse actions taken thereafter are retaliatory." *Estrada v. Gomez*, 1998 WL 514068 * 3 (N.D. Cal. 1998).   The overall circumstances of the alleged retaliation must be considered and not simply the order of events.   *Id.*   The *Estrada* court's comments on inferring retaliatory motive through timing alone are instructive:

> The oversimplified "timing and knowledge" analysis has numerous problems. First, it presumes vindictiveness by the prison guard. Second, it elevates a prisoner who exercises his constitutional rights to a higher status: e.g., if a guard refuses to serve lunch to a prisoner who told him he filed a grievance and to a prisoner who had not done so, the former would have a retaliation claim and the latter would not. Third, it encourages litigiousness because, with planning, a prisoner could have constant federal court supervision of his tenure in prison. An industrious prisoner could file a grievance when he arrived at prison and perhaps weekly thereafter, broadcast his grievance-filing activities widely, and then file federal civil rights actions claiming that every later adverse action by a guard was retaliatory. The court would be asked to pass on the legitimacy of all actions the prisoner did not like. Fortunately, a closer look at the law of retaliation shows that the standard is slightly higher and the claim is not so susceptible to manipulation.

REPORT AND RECOMMENDATION - 20

1

2   *Id.* at n. 2.

3        Here, Plaintiff provides no credible, admissible evidence to support his claim that

4   Defendants conspired to deny his request for an orthopedic consult or that they transferred him.

5   In addition, Plaintiff fails to demonstrate any causal link between the filing of his grievance and

6   the findings of the CRC panel that a consult was not medically necessary.  There is no evidence,

7   either direct or circumstantial that the conclusion reached by the twenty-five member CRC panel

8   or any transfer of Plaintiff within DOC was motivated by a desire to retaliate against Plaintiff

9   because he filed a grievance complaining that he was not "getting the medical care that he should

10   have gotten…".  ECF No. 7, p. 7.  Accordingly, the undersigned recommends that summary

11   judgment on this claim is also appropriate.

12

13   **E.      Personal Participation of Defendants**

14        Defendants argue that Plaintiff has failed to allege the personal participation of

15   Defendants Gregoire, Vail, Glebe and Reninger, all of whom played no role in decisions

16   concerning Plaintiff's medical treatment or health care decisions.  ECF No. 26, p. 15.  As noted

17   above, Governor Gregoire, Eldon Vail and Pat Glebe are not parties to this action.  With regard

18   to SCCC's Health Care Manager, Defendant Reninger, Plaintiff alleges that she "conspired as a

19   member of the CRC with Defendants Hammond and Lopez to deny him needed medical

20   treatment.  ECF No. 7, p. 8.  He alleges that she knew that repair of Plaintiff's bicep was "badly

21   needed" but she chose to deny the treatment and told him that if he wanted the repair, he would

22   have to pay his own costs.  *Id.*

23

24        As noted above, however, Plaintiff's claims that Defendants, including Kathy Reninger,

25   violated his Eighth Amendment rights are without evidentiary support.  Similarly, his allegation

26

REPORT AND RECOMMENDATION - 21

that Kathy Reninger "conspired" with the other Defendants to deny him that treatment is vague, conclusory, and without evidentiary basis.

Accordingly, the undersigned recommends that Plaintiff's Eighth and Fourteenth Amendment claims against Defendant Reninger be dismissed with prejudice.

**F.      Qualified Immunity**

Defendants argue, in the alternative, that they are entitled to qualified immunity.  As the Court has concluded that Plaintiff has failed to raise material issues of fact relating to his constitutional claims, it is not necessary to address this issue.

**CONCLUSION**

For the reasons stated above, the undersigned recommends that Defendants' motion for summary judgment (ECF No. 26) be **GRANTED;** that Plaintiff's federal claims be **dismissed with prejudice,** and Plaintiff's pendent state law tort claims be **dismissed without prejudice.**

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **June 10, 2011,** as noted in the caption.

**DATED** this _23rd_ day of May, 2011.


                                        Karen L. Strombom
                                        United States Magistrate Judge


REPORT AND RECOMMENDATION - 22